# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) |  |  |
|---|---|---|---|
| Plaintiff, | ) |  |  |
| v. | ) | No. | 18-CR-172-JED |
| DAVID MASON LESLIE, JR., | ) |  |  |
| Defendant. | ) |  |  |

## OPINION AND ORDER

Defendant David Mason Leslie, Jr., has been charged in a superseding indictment (Doc. 36) with one count of drug conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(vii), and one count of interstate travel and transportation in aid of racketeering enterprises, in violation of 18 U.S.C. §§ 1952(a)(3) and (a)(3)(A). Before the Court is Leslie's Motion to Suppress (Doc. 36), which centers around a traffic stop that occurred on July 30, 2018, in Omaha, Nebraska. In his Motion, Leslie requests an order suppressing all evidence seized from his person, the vehicle he was driving, and the trailer he was towing on that date.

On April 5, 2019, the Court held a hearing on the Motion and admitted Plaintiff's Exhibits (PX) 1 through 10, including dashcam video from the date in question (PX 3). The Court also heard testimony from Deputy Eric Olson of the Douglas County Sheriff's Office in Omaha, Nebraska.

**I.   Statement of Facts**

Upon careful consideration of the in-court testimony and the admitted exhibits, the Court

makes the following statement of facts.[1]

Early in the morning on July 30, 2018, Deputy Eric Olson was parked along eastbound I-80 in Omaha, Nebraska. Deputy Olson is part of the criminal interdiction unit of the Douglas County Sheriff's Department in Omaha. Olson is also a K-9 handler, and his assigned K-9, Fletch, was with him at the time.

At around 5:30 a.m., Deputy Olson observed and decided to follow a large SUV with a Pennsylvania license plate towing a U-Haul trailer with an Indiana plate. As Olson caught up to the SUV, the SUV changed lanes and slowed significantly to below the minimum speed limit of 40 mph. Olson also noticed that the U-Haul trailer had an oversized, heavy-duty "smuggler's lock" on it. Olson continued to follow the vehicle as it exited I-80 onto I-680 northbound and then exited I-680 toward West Center Road. While on the off-ramp toward West Center Road, Olson observed that Leslie was exceeding the 55-mph speed limit.

Olson continued to follow Leslie for several more minutes before pulling him over. Olson then approached the vehicle and confirmed that there was very little in the rear cargo area of the SUV—only a midsized suitcase and a couple of other small bags or other items. Upon reaching the driver's window, Olson immediately asked for Leslie's driver's license and informed him of the observed traffic violation. While Olson reviewed the driver's license, he asked questions about Leslie's destination and occupation. Leslie stated that he was headed to a friend's house in Omaha and that he was a truck driver.

At that point, Olson asked Leslie for the rental agreement for the SUV. He also asked Leslie where he was coming from, to which Leslie gave an evasive, incomplete answer: "Coming

---

[1] Pursuant to Fed. R. Crim. P. 12(d), "[w]hen factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."

2

from…coming from….” Instead of finishing the sentence, Leslie handed Olson a piece of paper, which may have been a hotel receipt, to show that he was coming from Reno, Nevada.

Once Leslie produced the SUV rental agreement, Olson asked several more questions while reviewing it, including why Leslie had rented the SUV in Oklahoma and why, if Leslie was a commercial truck driver, he was not driving the commercial truck at the time. Olson explained that he was going to pick up his truck in Minnesota after retrieving his friend in Omaha. Olson also asked Leslie if he had ever been arrested for anything, and Leslie stated that he had not.

Next, Olson asked to see the rental agreement for the trailer. It ultimately took Leslie about five minutes to locate the trailer rental agreement. During that time, Olson continued to question Leslie. He asked more about Leslie's itinerary, his time in Nevada, and the contents of the trailer. At one point, Leslie asked to get out of his vehicle in order to check for the trailer rental agreement in the trunk. While Leslie continued to search, Olson asked more questions. When Olson asked Leslie where his friend lived in Omaha, Leslie balked, telling Olson that he felt like he was being interrogated and that he was "ex-military" and "ex-law enforcement." When asked about what he was hauling in the trailer, Leslie stated that it held some clothes and cabinets.

Once Leslie finally located the agreement, Olson and Leslie discussed the fact that Leslie was returning the trailer in St. Paul, Minnesota. Leslie explained that he was taking his and his friend's belongings to Leslie's commercial truck in St. Paul. According to Leslie, he and his friend were then going on a two-week vacation.

At this point, Olson walked back to his patrol car and made a call to run a records check on Leslie using the license and paperwork Leslie had given him. After a few minutes, Olson got back out of the patrol car and approached Leslie with a second officer who had shown up at the scene. Olson questioned Leslie again about whether he had any prior arrests and pointed out that

3

Leslie was arrested for narcotics in 1988. Olson then informed Leslie that he was giving him a warning for the traffic infraction but that he was going to do a dog sniff around the SUV and trailer. Leslie stated that he did not give consent.

Olson then retrieved his K-9, Fletch, and conducted a dog sniff. After Fletch indicated to the trailer, Olson took the key to the trailer and opened it, finding a significant amount of marijuana inside. Leslie was then put in handcuffs and told to remain in the patrol car.

## II. Relevant Law

When a law enforcement officer performs an investigative detention of a person, it is referred to as a *Terry* stop. *See United States v. Hernandez*, 847 F.3d 1257, 1267-68 (10th Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Because a *Terry* stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest." *Id*. at 1268. Still, such a stop is only permissible when an officer has "specific and articulable facts and rational inferences drawn from those facts" that give rise to a reasonable suspicion that a person is involved in criminal activity. *Id*.

"A valid traffic stop must be based on an observed traffic violation or a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Cline*, 349 F.3d 1276, 1286 (10th Cir. 2003) (internal quotation marks omitted) (*citing United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001)). The fact that an officer may have other motivations for stopping a person is irrelevant. *Id*. (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Nevertheless, the scope of an investigative detention "must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for

4

the violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). While an officer's "mission" typically includes inquiries such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance, there must be independent reasonable suspicion to support prolonging a stop—for example, to conduct a dog sniff. *See id*. at 1615.

The existence of reasonable suspicion to support prolonging a stop "does not depend upon any one factor, but on the totality of the circumstances." *Hernandez*, 847 F.3d at 1268 (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)). "Common sense and ordinary human experience are to be employed, and deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Wood*, 106 F.3d at 946 (internal citation omitted). Moreover, Supreme Court precedent precludes a "divide-and-conquer" approach in which a reviewing court evaluates and rejects factors in isolation from each other. *See United States v. Arvizu*, 534 U.S. 266, 266-67 (2002).

Ultimately, the government has the burden of proof to justify warrantless searches and seizures. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). The applicable standard of proof is a preponderance of the evidence. *Id.*

### III. Analysis

#### A. The initial stop was justified based on reasonable articulable suspicion of a traffic violation.

As noted above, "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71

5

F.3d 783, 787 (10th Cir. 1995). The Court's "sole inquiry" is whether the officer "had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction.'" *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

At the evidentiary hearing, Deputy Olson testified that, while following Leslie as he exited I-80 and then exited I-680, Olson began "pacing" Leslie's vehicle. (Tr. 10). Olson explained that he "maintained an equal distance between [himself] and the suspect vehicle" and utilized his own speedometer and a GPS read-out to determine that Leslie's vehicle "was driving approximately 55 miles an hour in a 50-mile-an-hour zone." (Tr. 10-11). The Court notes that Olson's vehicle was not equipped with radar or LIDAR technology. (Tr. 26).

The dashcam video provided to the Court is consistent with Deputy Olson's testimony. The video, which provides speed data for Deputy Olson's vehicle, shows that Olson was driving upwards of 55 mph—and not visibly gaining ground on Leslie—as the two vehicles passed the 50-mph speed limit sign on the off-ramp. The Court concludes that the dashcam footage, as well as Olson's in-court testimony, support a finding that Olson had reasonable articulable suspicion that a traffic violation had occurred—specifically, a violation of Neb. Rev. Stat. Ann. § 60-6,186.[2] For that reason, the initial traffic stop—although it occurred several minutes later—was valid under the Fourth Amendment.

### B. Deputy Olson's initial questions and requests for the rental agreements were within the "mission" of the traffic stop.

Whether the stop was justified at its inception is only the first step of the Court's inquiry;

---

[2] Neb. Rev. Stat. Ann. § 600-6,186 sets the maximum speed limits for different types of roads in the state.

the Court must also determine whether the officer's actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Holt*, 229 F.3d 931, 934 (10th Cir. 2000) (quoting *Terry*, 392 U.S. at 20).

The Tenth Circuit has repeatedly held that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) (citing cases). An officer may also ask about a driver's criminal history, which Olson did by asking about any prior arrests. *See United States v. Cone*, 868 F.3d 1150, 1151 (10th Cir. 2017) ("The proper scope of a traffic stop includes 'certain negligibly burdensome precautions' taken for officer safety."). In general, an officer may ask questions, "whether or not related to the purpose of the stop, so long as they do not prolong the stop." *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015).

After carefully reviewing the dashcam footage, the Court finds that the vast majority of the questioning by Olson occurred while Olson was reviewing the SUV rental agreement, waiting for the trailer rental agreement, or reviewing the trailer rental agreement. There is admittedly little case law concerning the appropriateness of a police officer asking for vehicle and/or trailer rental agreements during a traffic stop. In *United States v. Bell*, the Sixth Circuit held that asking about a rental agreement and investigating whether the driver had permission to operate the rental car was within the purpose of the initial traffic stop. 555 F.3d 535, 542 (6th Cir. 2009). Likewise, in *United States v. Ray*, Judge Claire V. Eagan treated a police officer's request to produce a rental agreement as a routine part of a traffic stop. Case No. 07-CR-0075-CVE, 2007 WL 1994071 (N.D. Okla. July 5, 2007).

As noted above, the Supreme Court has identified several "ordinary inquiries" incident to a traffic stop, such as checking a driver's license and inspecting a vehicle's registration and proof

7

of insurance. *Rodriguez,* 135 S. Ct. at 1615. The Court finds that inspecting the rental agreements for a vehicle and trailer is similar to these other common inquiries. In asking to see the rental agreements, Deputy Olson was trying to determine whether Leslie was authorized to be driving the vehicle and towing the trailer. The Court does not view these requests as falling outside of the "mission" of the traffic stop. Therefore, the questioning that occurred in the process of requesting and waiting for the rental agreements did not itself prolong the stop. To the extent a couple of questions may have been both (1) unrelated to the traffic stop and (2) not asked while Olson was waiting for or reviewing the rental agreements, the Court finds that such brief questions did not "measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

### C. Reasonable suspicion supported extending the stop to conduct a dog sniff.

Once Deputy Olson was able to review the trailer rental agreement, he returned to his patrol car and did a records check. This records check informed Olson that Leslie had not been honest about his prior arrest history. With this knowledge, in addition to several other factors, Olson had reasonable suspicion to support extending the stop to conduct a dog sniff. The Court will briefly address each of the factors that, taken together, supported reasonable suspicion.

#### 1. The time of day

The Court first considers that the traffic stop occurred early in the morning, at approximately 5:30 a.m. Though this factor would clearly not support reasonable suspicion on its own, the Tenth Circuit has held that the time of day a detention occurs may be considered in assessing reasonable suspicion. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997). Here, the Court finds that the early hour of the morning contributed some to Olson's reasonable suspicion, though the Court gives this factor little weight.

### 2. The "smuggler's" lock on the U-Haul trailer

One of the first things that Olson noticed about vehicle and trailer was the so-called "smuggler's lock" on the U-Haul trailer. Olson testified that he has seen people use such locks when hiding large amounts of narcotics in trailers or RVs. (Tr. 30). The presence of this type of heavy-duty lock on the U-Haul trailer, thus, contributed to Olson's reasonable suspicion.

### 3. Leslie's dramatic slowdown on the interstate

As mentioned above, Leslie dramatically slowed down on the interstate once Deputy Olson began to follow him. In fact, he slowed down below the minimum speed limit. This behavior also contributed to Olson's reasonable suspicion because it suggested that Leslie was overly nervous about being pulled over.

### 4. Leslie's implausible travel itinerary and evasive responses regarding his travel

One of the strongest factors in support of reasonable suspicion in this case was Leslie's illogical travel itinerary. "Bizarre travel plans may, by themselves, contribute to reasonable suspicion that criminal rather than innocent activity is under way." *United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011). According to Leslie and the rental agreements he provided to Olson, Leslie had rented the SUV in Tulsa and had driven to Nevada to gamble. He had then rented the U-Haul trailer in Reno, Nevada, and headed to Omaha to pick up his friend. From there, Leslie and his friend were going to go to St. Paul, Minnesota, where Leslie would drop off the trailer and pick up his commercial truck. Yet, according to the SUV rental agreement, the SUV was set to be dropped off back in Tulsa, Oklahoma. This inconsistency reasonably contributed to Deputy Olson's suspicion.

Moreover, Leslie suggested that he would be transferring the items from the U-Haul trailer

9

to his commercial truck in St. Paul. Based on Olson's training and experience, this seemed unrealistic, given that most commercial tractor-trailers have little space for personal property. (Tr. 16).

Leslie also gave evasive responses to inquiries about how travel plans. When asked where he was coming from, Leslie began to answer and then trailed off. When asked for the address of his girlfriend in Omaha—presumably where he was headed at the time of the traffic stop—Leslie changed the subject and asserted that he was formerly in the military and in law enforcement. Olson testified that, in his experience, people use such "good-guy qualifiers" to attempt to look like law-abiding citizens. (Tr. 18).

Overall, the Court gives this factor considerable weight. Leslie's bizarre and improbable travel plans, combined with his evasive responses concerning his travel, reasonably contributed to Deputy Olson's sense that criminal activity was afoot.

### 5. The absence of excess luggage in Leslie's rental car

During the stop, Deputy Olson made note of the absence of excess luggage in the cargo area of Leslie's rental SUV. Based on his training and experience, Olson found this odd, given that a trailer is typically used for overflow. (*See* Tr. 14-15). While the Court does not assign this factor significant weight, it is relevant in considering the totality of the circumstances here. *See United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006) (holding that the inconsistency between the amount of luggage and stated travel plans contributed to probable cause); *cf. Reid v. Georgia*, 448 U.S. 438, 441 (characterizing a flight passenger's lack of luggage as a circumstance that could "describe a very large category of presumably innocent travelers").

### 6. Leslie's nervousness during the stop

Deputy Olson also testified that Leslie exhibited signs of nervousness during the stop.

10

Olson testified that Leslie appeared to be "overly nervous" while looking for the trailer rental agreement; in fact, Leslie told Olson outright that he felt "flustered." (Tr. 18). Though the Tenth Circuit has generally found that nervousness should be assigned limited significance in examining the totality of the circumstances, it may be considered as a relevant factor. *See United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004) ("[N]ervousness, even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded.").

### 7. Leslie's inaccurate statement about his arrest history

As explained above, Deputy Olson questioned Leslie about his arrest history, and Leslie told him that he had not prior arrests. When Olson conducted a records check, he learned that Leslie had a narcotics arrest from 1988. Because this arrest apparently did not result in a charge or conviction, and because of its staleness, the Court does not assign this factor much weight. Nonetheless, the Court finds that Olson reasonably considered this discrepancy in Leslie's answer—as well as the fact that the prior arrest was for narcotics—in determining whether to prolong the stop.

None of the above-mentioned factors by themselves would amount to reasonable suspicion to justify prolonging the traffic stop to conduct a dog sniff. However, the Court cannot view each factor in isolation; instead, the undersigned must take all of the relevant factors together to determine whether, in the totality of the circumstances, Deputy Olson had reasonable suspicion of criminal activity to support extending the stop beyond its initial justification. In light of the time of day, Leslie's use of a smuggler's lock on the U-Haul trailer, Leslie's implausible travel itinerary and evasive answers about his travel, the absence of excess luggage in the cargo area of the rental car, Leslie's nervousness, and Leslie's inaccurate statement about his arrest history, the Court finds

that Deputy Olson had reasonable suspicion of criminal activity to justify conducting the dog sniff.

### D. The K-9's alert and indication provided probable cause to justify a search of the trailer.

Once Deputy Olson had retrieved his K-9, Fletch, he walked Fletch around the side of the trailer and SUV. According to Olson's testimony, Fletch "pull[ed] [him] back to the trailer to the front right lower corner" and started "detailing that area, alerting there." (Tr. 21). Fletch then did a "stand-and-stare," which is his typical indication for a roadside deployment that signifies he has detected a narcotics odor. (Tr. 22). The Court finds that this alert and indication by Fletch provided Deputy Olson with probable cause to search the rental trailer. Once Olson saw that the trailer contained a significant amount of marijuana, there was clearly probable cause to conduct further searches for other evidence of criminal activity.

## IV. Conclusion

For the foregoing reasons, the Court finds that the July 30, 2018 search was lawful and that the evidence gained from that search should not be suppressed. Defendant Leslie's Motion to Suppress (Doc. 31) is hereby **denied**.

**SO ORDERED** on this 11th day of April, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT